IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, et al., | |
| Plaintiffs, | |
| | Civil Action No. 2:99-cv-1181 |
| v. | |
| | Judge Sargus |
| OHIO EDISON COMPANY, et al., | Magistrate Judge Kemp |
| Defendants. | |

## JOINT MOTION TO MODIFY CONSENT DECREE
## WITH ORDER MODIFYING CONSENT DECREE

WHEREAS on July 11, 2005, this Court entered a Consent Decree in the above-captioned matter.

WHEREAS pursuant to Paragraph 83, by no later than December 31, 2008, Ohio Edison shall elect either to: satisfy the emission control requirements of Paragraph 82 for Burger Units 4 and 5; shut down Burger Units 4 and 5 no later than December 31, 2010; or repower Burger Units 4 and 5 no later than December 31, 2012, including through the construction of circulating fluidized bed boilers or other clean coal technologies of equivalent environmental performance.

WHEREAS pursuant to Paragraph 83.b, if Ohio Edison elects to repower Burger Units 4 and 5 including through the construction of circulating fluidized bed boilers or other clean coal technologies of equivalent environmental performance, such units are required to achieve and maintain a 30-day Rolling Average Emission Rate not greater than 0.100 lb/mmBtu for SO2 or a Removal Efficiency of at least ninety-five percent

2

(95%) for SO2; a 30-Day Rolling Average Emission Rate not greater than 0.100 lb/mmBtu for NOx; and a PM Emission Rate not greater than 0.015 lb/mmBtu.

WHEREAS by Order dated January 30, 2009, this Court extended Ohio Edison's election requirement from December 31, 2008 to March 31, 2009.

WHEREAS prior to March 31, 2009, Ohio Edison informed the United States, and the states of Connecticut, New Jersey, and New York ("the Plaintiffs") that the company was interested in repowering Burger Units 4 and 5 to combust biomass fuel.

WHEREAS Ohio Edison has represented to the Plaintiffs that it intends to combust 100% biomass fuel but that it may be necessary to co-fire Burger Units 4 and 5 with a fossil fuel.

WHEREAS on March 31, 2009, Ohio Edison elected to repower Burger Units 4 and 5 to combust principally biomass fuel.

WHEREAS concurrent with Ohio Edison's election, the parties reached preliminary agreement, subject to formal approval by Plaintiffs' respective senior management, regarding a proposed modification to the Consent Decree.

WHEREAS all parties have obtained the necessary approvals for the proposed modification to the Consent Decree for the repowering project at Burger Units 4 and 5.

For good cause shown, the parties hereby seek to modify the Consent Decree in this matter, and move that the Court sign and enter the following Order:

1. Modify Paragraph 83 as follows:

83. No later than March 31, 2009, Ohio Edison shall elect either to satisfy the emission control requirements of Paragraph 82 for Burger Units 4 and 5, or:

    a. Shut down Burger Units 4 and 5 no later than December 31, 2010;

    b. Repower Burger Units 4 and 5 no later than December 31, 2012, including through construction of circulating fluidized bed boilers or other clean coal technologies

3

of equivalent environmental performance that at a minimum achieve and maintain a 30-Day Rolling Average Emission Rate not greater than 0.100 lb/mmBtu for $SO_2$ or a Removal Efficiency of at least ninety-five percent (95%) for $SO_2$; a 30-Day Rolling Average Emission Rate not greater than 0.100lb/mmBtu for $NO_X$; and a PM Emission Rate not greater than 0.015 lb/mmBtu;

>  or

> c. Repower Burger Units 4 and 5 no later than December 31, 2012 to combust principally biomass fuels and commence operation. Ohio Edison has elected this option, which shall be undertaken in accordance with the following requirements:
>
>> i. For purposes of Paragraph 83.c, the term "biomass fuels" shall mean a blend of renewable feedstock consisting solely of: wood (including residues from harvesting or processing such as bark, leaves, wood chips, sawdust, and byproducts from paper manufacturing, but solely if the manufacturing process does not use any chlorinated compounds for bleaching), agricultural crops, grasses, dedicated energy crops (including, but not limited to, trees, grasses, and shrubs), other vegetation waste or products (including, but not limited to, landscape or right-of-way trimmings, algae, food waste and by-products), including up to five percent (5%) binding materials or additives that have demonstrated emission reduction properties and/or other biomass fuels proposed by OE and approved by the Plaintiffs prior to use, but in no event shall biomass fuels include animal wastes, sewage sludge, construction debris, or non-natural wood such as plywood, pressure-treated wood and the like;
>>
>> ii. Beginning not later than six (6) months following the date of lodging of this Modified Consent Decree, and continuing throughout the operation of the Burger repowering project as appropriate, OE shall consult regularly with government agencies, public interest groups and scientific, environmental and other technical consultants, including agricultural and forest experts, on issues related to ensuring a sustainable biomass fuel supply for the Burger repowering project. OE shall exercise reasonable best efforts to advance forestry best management practices towards ensuring a sustainable biomass fuel supply.
>>
>> iii. Once Burger Units 4 and 5 commence operation following completion of the projects necessary to permit combustion principally of biomass fuels, Ohio Edison shall continuously operate all combustion control and pollution control equipment at Burger Units 4 and 5, including such equipment as ESP, SNCR, low-NOx burners, and over-fired air

4

consistent with good engineering practices to minimize emissions to the extent practicable;

iv.         During the first 180 days after Burger Units 4 and 5 commence operation following completion of the projects necessary to permit combustion principally of biomass fuels (the "Shakedown Period"), Ohio Edison shall operate the Burger Units 4 and 5 using its reasonable best efforts to achieve and maintain a 30-Day Rolling Average Emission Rate for SO2 of 0.100 lb/mmBtu, a 30-Day Rolling Average Emission Rate for NOx of 0.100 lb/mmBtu, and a PM Emission Rate of 0.015 lb/mmBtu;

v.         If, by the end of the Shakedown Period, Ohio Edison is able to achieve and maintain the emission rates specified in subparagraph 83.c.iii at representative operations, then Burger Units 4 and 5 shall be subject to the emission rates specified in subparagraph 83.c.iii immediately following the end of the Shakedown Period. Ohio Edison shall thereafter comply with those rates. If, by the end of the Shakedown Period, Ohio Edison is unable to achieve and maintain the emission rates specified in subparagraph 83.c.iii at representative operations, then a second 180-day operating period (the "Cure Period"), shall apply. During the Cure Period, Ohio Edison shall optimize Burger Units 4 and 5 in order to achieve the emission rates specified in subparagraph 83.c.iii, if feasible, using its reasonable best efforts. At a minimum, Ohio Edison shall optimize Burger Units 4 and 5 to reduce emissions by undertaking upgrades or modifications to the boilers, combustion controls, and/or pollution controls, and/or by reducing the percentage of low sulfur western coal as part of the co-firing operation of Burger Units 4 and 5. For purposes of this subparagraph, Ohio Edison shall not be required to install Flue Gas Desulfurization (as defined by Paragraph 22 of the Consent Decree), Selective Catalytic Reduction System (as defined by Paragraph 45 of the Consent Decree), or baghouse systems as part of its reasonable best efforts to achieve the emission rates specified in subparagraph 83.c.iii;

vi.         At all times during the Shakedown Period and Cure Period, emissions at Burger Units 4 and 5 shall not exceed the following: for SO2, a 30-Day Rolling Average Emission Rate not greater than 0.150 lb/mmBtu, for NOx, a 30-day Rolling Average Emission Rate not greater than 0.200 lb/mmBtu, and for PM, a PM Emission Rate not greater than 0.020 lb/mmBtu;

vii.         At the expiration of the Cure Period, Ohio Edison shall submit a compliance plan to Plaintiffs for review and approval pursuant to Section XIII (Review and Approval of Submittals) in which Ohio Edison shall propose a 30-Day Rolling Average Emission Rate for NOx and SO2 and a PM Emission Rate for Burger Units 4 and 5 consistent with Ohio Edison's reasonable best efforts during the Shakedown and Cure Periods to achieve and maintain the emission rates specified in subparagraph 83c.iii, based upon the emission data generated by

Ohio Edison during the Shakedown Period and Cure Period. In no event shall Ohio Edison propose a 30-Day Rolling Average Emission Rate greater than 0.150 lb/mmBtu for $SO_2$, a 30-Day Rolling Average Emission Rate greater than 0.200 lb/mmBtu for $NO_X$, or a PM Emission Rate greater than 0.020 lb/mmBtu or a 30-Day Rolling Average Emission Rate lower than 0.100 lb/mmBtu for $SO_2$, a 30-Day Rolling Average Emission Rate lower than 0.100 lb/mmBtu for $NO_X$, or a PM Emission Rate lower than 0.015 lb/mmBtu. Upon approval of the compliance plan by Plaintiffs, Ohio Edison shall comply with the 30-Day Rolling Average Emission Rate for NOx and SO2 and PM Emission Rate for Burger Units 4 and 5 approved under the plan;

 viii. At all times during the Shakedown and Cure Periods, co-firing of coal, if any, in Burger Units 4 and 5 shall be limited to low-sulfur western coal. Following the Shakedown Period (or Cure Period, if applicable), Ohio Edison shall seek approval from the Plaintiffs prior to co-firing more than twenty percent (20%) by weight low sulfur western coal in Burger Units 4 and 5. Following approval by the Plaintiffs, the emissions rates listed in subparagraph 83. c.iii above shall apply during any period in which more than twenty percent (20%) by weight low sulfur western coal is co-fired in Burger Units 4 and 5; and

ix. Reporting and Testing Requirements. No later than 30 days after the end of each quarterly period commencing at the start of the Shakedown Period until the end of the Cure Period, Ohio Edison shall report to Plaintiffs pursuant to Paragraphs 144 and 185 SO2 and NOx emissions data as determined by CEMS in accordance with 40 C.F.R. Part 75 on both a daily basis and 30-day rolling average basis, and emissions data for PM from any PM stack test performed at Burger Units 4 and 5 regardless of the number of test runs or length of such runs. Using the reference methods described below for measuring the PM Emission Rate, Ohio Edison shall conduct two stack tests during the Shakedown Period – the first one within the first 90 days of the Shakedown Period and the second one within the second 90 days of the Shakedown Period -- and two stack tests during the Cure Period (if a Cure Period is required for PM) – the first one within the first 90 days of the Cure Period and the second one within the second 90 days of the Cure Period.

 In measuring the PM Emission Rate, Ohio Edison shall conduct periodic stack tests in accordance with 40 C.F.R. Part 60, Appendix A, Method 5, or Method 5B, or alternative methods requested by Ohio Edison and approved by EPA. For units that are required to be equipped with $SO_2$ control equipment and that are subject to the percent removal efficiency requirements of this Consent Decree, the outlet $SO_2$ Emission Rate and the inlet $SO_2$ Emission Rate shall be determined based on the data generated in accordance with 40 C.F.R. Part 75 (using $SO_2$ CEMS data from both the inlet and outlet of the control device), except that, if it is not feasible to install $SO_2$ CEMS at the inlet of the control

<u>device, Ohio Edison may use fuel sampling consistent with ASTM protocols and standards to compute the inlet $SO_2$ Emission Rate.</u>

2. Modify Section XIV (Stipulated Penalties), by adding items r., s., t., u. and v. to the table of "Stipulated Penalties" as follows:

| Consent Decree Violation | Stipulated Penalty (Per day per violation, unless otherwise specified) |
|---|---|
| r. Use of biomass fuels other than as stated in or not in accordance with Paragraph 83ci. or approved by Plaintiffs prior to use | $15,000 per day, except the Stipulated Penalty shall be reduced to $1,500 per day for the first thirty (30) days of violation only, provided OE establishes that (1) use of such fuel during the initial 30-day period of violation was due to the fact that the vendor supplying the biomass fuel for Burger Units 4 and 5 delivered biomass fuel that was not in accordance with the requirements of Paragraph 83c.i (or as otherwise approved by Plaintiffs), and (2) Burger Units 4 and 5 achieved and maintained the applicable 30-Day Rolling Average Emission Rate for NOx and SO2 and the Emission Rate for PM for that initial 30-day period of violation |
| s. Once Burger Units 4 and 5 commence operation following completion of the projects necessary to permit combustion principally of biomass fuels, failure to continuously operate all combustion control and pollution control equipment at Burger Units 4 and 5, including such equipment as ESP, low-Nox burners and over-fired air, consistent with good engineering practices to minimize emissions to the extent practicable, in accordance with Paragraph 83c.ii | $3,500 per day |
| t. If a Cure Period applies to the repowering of Burger Units 4 and 5 with biomass fuels, failure to optimize Burger Units 4 and 5, as required by Paragraph 83c.iv., in order to achieve the emission rates specified in Paragraph 83c.iii, if feasible, using its reasonable best efforts | $40,000 for entire Cure period; following the Cure Period, $4,000 per day of operation of Burger Units 4 and 5 commencing on the day that Plaintiffs provide written notice to OE specifying such failure to optimize Burger Units 4 and 5 until OE completes such optimization of Burger Units 4 and 5 |

7

| | |
|---|---|
| u. Failure to co-fire, if at all, with only low sulfur western coal in Burger Units 4 and 5 during Shakedown and Cure Periods. Following Shakedown Period (or Cure Period, if applicable), failure to seek approval from Plaintiffs prior to co-firing more than twenty percent (20%) **by weight** low sulfur western coal in Burger Units 4 and 5, in accordance with Paragraph 83c.vii | $50,000 per day |
| v. Failure to conduct stack tests on Burger Units 4 and 5 during the Shakedown and Cure Periods in accordance with Paragraph 83c.viii | $1,000 per test per day |

3. Modify Paragraph 164 as follows:

164. Potential Force Majeure Events. The Parties agree that, depending upon the circumstances related to an event and Ohio Edison's response to such circumstances, the kinds of events listed below are among those that could qualify as Force Majeure Events within the meaning of this Section: construction, labor, or equipment delays; malfunction of a unit or emission control device; biomass fuel or coal supply interruption; acts of God; acts of war or terrorism; and orders by a government official, government agency, or other regulatory body acting under and authorized by applicable law that directs Ohio Edison to supply electricity in response to a system-wide (state-wide or regional) emergency. Depending upon the circumstances and Ohio Edison's response to such circumstances, failure of a permitting authority to issue a necessary permit in a timely fashion may constitute a Force Majeure Event where the failure of the permitting authority to act is beyond the control of Ohio Edison and Ohio Edison has taken all steps available to it to obtain the necessary permit, including, but not limited to: submitting a complete permit application; responding to requests for additional information by the permitting authority in a timely fashion, and accepting lawful permit terms and conditions after expeditiously exhausting any legal rights to appeal terms and conditions imposed by the permitting authority.

4. Except as specifically provided in this Order, all other terms and conditions of the Consent Decree remain unchanged and in full effect.

SO ORDERED THIS 10th DAY OF February 2010

_____
UNITED STATES DISTRICT JUDGE
Edmund A. Sargus, Jr.

8

Respectfully submitted,

**FOR THE UNITED STATES OF AMERICA:**


/s/ John C. Cruden
JOHN C. CRUDEN
Acting Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice


/s/ Jerome W. MacLaughlin
JEROME W. MACLAUGHLIN
ARNOLD S. ROSENTHAL
Environmental Enforcement Section
Environment and Natural Resources Division
United States Department of Justice
P.O. Box 7611
Washington, D.C. 20530
(202) 514-0056


/s/ Cynthia Giles
CYNTHIA GILES
Assistant Administrator
Office of Enforcement and Compliance Assurance
U.S. Environmental Protection Agency


/s/ Adam M. Kushner
ADAM M. KUSHNER
Director, Office of Civil Enforcement
Office of Enforcement and Compliance Assurance
U.S Environmental Protection Agency

**FOR THE STATE OF CONNECTICUT:**

RICHARD BLUMENTHAL
ATTORNEY GENERAL
STATE OF CONNECTICUT